UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

UNITED STATES OF AMERICA                                                          Plaintiff

v.                                                              Criminal Action No. 3:19-CR-22-RGJ

ERIC WISE                                                                          Defendant

\* \* \* \* \*

**MEMORANDUM OPINION AND ORDER**

Eric Wise ("Wise") moves to suppress evidence [DE 24] and dismiss the indictment [DE 25]. These matters are ripe. [DE 27; DE 31; DE 34; DE 36; DE 41]. For the reasons below, the Court **DENIES** both motions [DE 24; DE 25].

I.     BACKGROUND

**A. Drug Trafficking Investigation.**

In 2016, Detective Halbleib ("Halbleib") learned from two confidential informants that Wise had bought kilograms of cocaine from Ambrocio Jennings ("Jennings"), a known drug trafficker. [DE 24-2 at 70]. Halbleib observed Wise leave Jennings' house and "drive directly" to 6357 Doe Run Road ("Doe Run Road"). [DE 24-2 at 70]. Based on his training and experience, Halbleib believed that Wise used Doe Run Road as a "stash house." *Id.* at 71. Through "surveillance and tracking[1] Wise's phone," Halbleib determined that Wise resided at both 9831 Valley Farms Blvd ("Valley Farms") and Doe Run Road (collectively, "Wise's residences"). *Id.* at 74.

On June 11, 2018, Halbleib stopped Leonel Camacho Flores and Aguilera Leysi Guadalupe, two known drug traffickers from Houston, Texas ("the Houston traffickers"), and

---

[1] Throughout his investigation, Halbleib obtained a series of "trap and trace" orders for Wise's cell phones.

1

recovered a kilogram of cocaine in their car. *Id.* at 69. Flores told Halbleib that Wise had bought cocaine and methamphetamine from their drug trafficking organization. *Id.* The Houston traffickers agreed to cooperate with Halbleib's investigation. *Id.* After calling Wise to set up a drug buy, they met him at the Jefferson Mall where Wise agreed to purchase six kilograms of cocaine from them for $28,000 per kilogram. *Id.* They also agreed that "Wise was to bring $84,000 for 3 kilograms and [the Houston traffickers] would front the additional 3 kilograms of cocaine and get the remaining $84,000 later." *Id.* Over the next nineteen hours, Wise and the Houston traffickers continued to talk. *Id.* During this time, Halbleib tracked Wise's cell phone to Doe Run Road and Valley Farms. *Id.* In the end, Wise grew increasingly suspicious and backed out of the deal. *Id*

On June 13, 2018, Halbleib obtained a search warrant for Doe Run Road and Valley Farms and, upon executing it, recovered a pistol from each residence. [DE 1].

**B. Narcoland.**

In July 2019, A&E premiered 60 Days In: Narcoland ("Narcoland"). A&E, https://www.aetv.com/shows/60-days-in-narcoland (last visited March 4, 2020). Narcoland provided a "look into how drug cartels have infiltrated America's Heartland." *Id.* Throughout the season, "teams [went] undercover in some of the most dangerous, drug-infested areas in the Midwest." *Id.* And "the Bullitt County Narcotics Unit led by Major Mike Halbleib provide[d] unique access into the unit's mission to take back the community by identifying drug traffickers and cartel-connected individuals, one offender at a time." *Id.* Relevant here, Halbleib made several comments on Narcoland about a drug trafficker named "Ghost."[2] Halbleib: 1) "showed a

---

[2] Although repeatedly showing the camera a blurry photo of an African-American male that he identifies as "Ghost," Halbleib never says that "Ghost" is Eric Wise. During the March 5, 2020 final pretrial conference, Wise's counsel confirmed the photo was of Wise and that "Ghost" was never identified to the audience as being Wise.

2

photo of ['Ghost'] to the audience and commented that he was a local dealer associated with a cartel who had been trafficking in drugs for almost 20 years"; 2) characterized "Ghost" as "'one of [their] biggest targets' for two decades"; 3) told "Ghost" that "'You've never had anybody on you like I'm on you . . . You're going to lose this one.'" [DE 25 at 78-79].

## II. DISCUSSION

### A. Motion to Suppress.[3]

Wise moves to suppress: 1) "All records of cell phone site location information ("CSLI") relating to the Defendant as a result of several "trap and trace" orders and a search warrant obtained from the Bullitt District Court"; 2) "The two pistols identified in Count 1 of the Indictment that form the basis of this prosecution under 18 USC §922(g)(1) that were seized by Bullitt County Deputy Sheriffs pursuant to warrants issued by the Bullitt Circuit Court for houses located at 6357 Doe Run Road and 9831 Valley Farms Boulevard in Jefferson County, Kentucky"; 3) "All testimony and evidence derived proximately or indirectly from these illegal seizures." [DE 24 at 53]. The United States contends that the Court should deny the motion because "Wise does not allege any intentional or reckless false statements in the affidavit in support of the search warrant." [DE 27 at 92].

---

[3] An evidentiary hearing is required "only if the [suppression] motion is sufficiently definite, specific, detailed, and non-conjectural to enable the court to conclude that *contested issues of fact* going to the validity of the search are in question." *United States v. Abboud*, 438 F.3d 554, 577 (6th Cir. 2006) (citing *United States v. Downs,* No. 96–3862, 1999 WL 130786, at *3 (6th Cir. Jan. 19, 1999) (emphasis added). Here, both parties agree and the Court finds that an evidentiary hearing is not required because Wise's arguments are "entirely legal in nature," and there are no "contested issues of fact" going to the validity of the search in question. *Id.*

### 1. The "Trap and Trace" Orders are Valid

Wise challenges the "trap and trace" orders from June 8, 2016 and May 14, 2018. Wise contends that they are invalid because they were signed by a state district court judge who, under 18 USC 3122(a)(2), lacked the authority to issue them. [DE 24 at 60 ("18 USC §3122(a)(2) authorizes applications for trap and trace orders by state law enforcement officers when made to a 'court of competent jurisdiction.' This latter term is defined in 18 USC § 3127(2)(B) as 'a court of general criminal jurisdiction of a State.' The judicial officer who signed all the trap and trace orders was Hon. Jennifer Porter, Bullitt District Court Judge" who presided over a court of limited, not general jurisdiction)]. The United States disagrees, arguing that Wise's "motion to suppress is entirely based on the assertion that a Kentucky district court judge does not have authority to issue a search warrant to be served in another county, and that the search warrants issued in this case, either for the search of premises or for the search of tracking data, were therefore void *ab initio*. This assertion is incorrect." [DE 27 at 92].

The officers obtained the "trap and trace" orders before the United States Supreme Court ruled on June 22, 2018 that "trap and trace" orders are "not a permissible mechanism for accessing historical cell-site records." *Carpenter v. United States*, 138 S. Ct. 2206, 2221 (2018) ("[A]n order issued under Section 2703(d) of the Act is not a permissible mechanism for accessing historical cell-site records. Before compelling a wireless carrier to turn over a subscriber's CSLI, the Government's obligation is a familiar one—get a warrant"). As a result, the officers did not obtain the "trap and trace" orders illegally.

Even so, the "trap and trace" orders here are still valid under the "good faith" exception. Wise argues that "[t]he Orders could not have been obtained in good faith because any statute relied on to authorize them required the signature of a circuit judge, not a district court judge."

[DE 31 at 101]. The United States asserts that the good-faith exception applies because "[a]t the time that the trap and trace applications were submitted in this case law enforcement officers were operating under the assumption that the statute was constitutional." [DE 34 at 124].

*United States v. Carpenter* is on point. On remand from the Supreme Court, the Sixth Circuit had to determine whether "the Government acquired Carpenter's CSLI in good faith reliance" on 18 USC § 2703(d). *United States v. Carpenter*, 926 F.3d 313, 317 (2019). Holding that the Government did, the Sixth Circuit noted that "nothing in the record suggests that the FBI agents who obtained [the defendant's] CSLI engaged in intentional misconduct." *Id.* at 318. Like in *United States v. Carpenter*, nothing here reflects that the officers engaged in "intentional misconduct."

Wise asserts that the good-faith exception cannot save the "trap and trace" orders because "[w]hen seeking the trap and trace orders, Lt. Col. Halbleib either did not bother to read the applicable federal statutes or he failed to comply with them as written. Every trap and trace order involved in this case was invalid for failure to meet the statutory conditions precedent for entry." [DE 41 at 197]. The Court disagrees. Judge Porter believed that she had the authority to sign the "trap and trace" orders even though, as Wise argues, she may not have. *See United States v. Moorehead*, 912 F.3d 963, 969 (2019) (applying the good-faith exception to warrant void ab initio as a result of a jurisdictional defect). And because a district court judge has the authority to issue search warrants, it was objectively reasonable for the officers to believe that a district court judge likewise had the authority to issue "trap and trace" orders. *See Heien v. North Carolina*, 574 U.S. 54, 66 (2014) ("The Fourth Amendment tolerates only *reasonable* mistakes, and those mistakes—whether of fact or of law—must be *objectively* reasonable") (emphasis in original). Furthermore, because "trap and trace" orders may no longer be used, exclusion would not deter this type of

5

alleged police misconduct because it can, as a practical matter, never recur. Finally and perhaps most importantly, Judge Porter signed these orders before *Carpenter*. As a result, it was objectively reasonable for the officers to rely on § 2703(d) and the Court will not exclude the evidence obtained from the "trap and trace" orders.

**2. The Search Warrants Are Valid**

Wise next challenges the validity of the June 9, 2016 and June 13, 2018 search warrants.[4]

*a. June 9, 2016 Warrant*

The June 9, 2016 search warrant was issued to AT&T for "[s]ubscriber information for any and all current phone numbers associated with Eric Wise." [DE 31-2 at 110]. Wise contends that the "June, 2016, search warrant is . . . void. This warrant was directed to AT&T in Florida. It is unclear from the record how AT&T was served . . . Unless the warrant was served in Kentucky on a process agent for AT&T, the warrant was never properly executed. If it was mailed, faxed or sent electronically to Florida, it was invalid." [DE 24 at 61].

To begin, Wise lacks standing to object to the June 9, 2016 search warrant. Although the Supreme Court has held that citizens have an expectation of privacy in CSLI, *Carpenter*, 138 S. Ct. at 2221, it has not held that they have an expectation of privacy in subscriber information. In fact, the Supreme Court reaffirmed in *Carpenter* that, under the third-party doctrine, a person does not have a reasonable expectation of privacy in "telephone numbers." *Id.* at 2216 ("[T]he third-

---

[4] Wise also argues that the warrants are invalid because Judge Porter, a state district court judge, lacked the authority to issue them. [DE 24 at 61]. The Supreme Court of Kentucky disagrees. *See Richmond v. Com.*, 637 S.W.2d 642, 645 (1982) ("Someone must have authority to issue warrants, and by virtue of that necessity we confirm that all district and circuit judges of this state have it"). But Wise argues that the *Richmond* court is wrong because its holding violates the separation of powers. [DE 41 at 198 ("[T]he Kentucky Supreme Court cannot, by common law opinion, decide that the District Court's jurisdiction should be different from that established by statute. The AT&T warrant . . . was void because the Kentucky General Assembly did not authorize search warrants signed by district court judges")]. *Richmond* has remained good law for nearly forty years, and the Court declines to second-guess it. The Court finds that Judge Porter was authorized to issue the search warrants in this case.

party doctrine applies to telephone numbers and bank records"); *See United States v. Maclin*, 393 F. Supp. 3d 701, 708 (N.D. Ohio 2019) (finding defendant did not have reasonable expectation of privacy in subscriber information). Because Wise does not have an expectation of privacy in his subscriber information, he lacks standing to object to its release to law enforcement. *United States v. Washington*, 573 F.3d 279, 282 (6th Cir. 2009).

But even if he did have standing to challenge the warrant, the warrant was properly executed and therefore Wise's challenge must fail. In support of his argument that the warrant was improperly executed, Wise cites *Stengel v. Kentucky Bar Ass'n*, 162 S.W.3d 914 (2005). Wise misinterprets *Stengel*. [DE 24 at 61 ("In *Stengel* . . . the Supreme Court modified a court rule and held that the proper method of obtaining documents from out of state entities is by grand jury subpoena. The procedure is authorized only if the entity agrees to accept it and is not misled into believing that the subpoena has extra-territorial effect"). Reviewing an opinion issued by the KBA Ethics Commission, the *Stengel* court found that "[i]n our opinion, it is not unethical to contact an entity out of state and to fax them a subpoena if requested, or to advise them that KRS 421.250 will be used, if necessary (as long as such use is intended at the time) if compliance is not forthcoming." *Stengel*, 162 S.W.3d at 920. Wise has not established, under the facts here or *Stengel*, that the June 9, 2016 warrant was improperly executed.

### b. June 13, 2018 Warrants

Wise argues "[t]he information provided within the four corners of the affidavits submitted with the application for warrants for Doe Run Road and Valley Farms Boulevard did not establish a 'fair probability that contraband or evidence of a crime' would be found at either place . . . The searches and seizures cannot be salvaged by the good-faith exception to the exclusionary rule

7

because the affidavits were so lacking in indicia of probable cause as to make reliance on them unreasonable." [DE 24 at 53-54]. The United States does not directly respond to this argument.

The Fourth Amendment requires that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. Amend. IV. Probable cause exists if "the facts and circumstances are such that a reasonably prudent person would be warranted in believing that an offense had been committed and that evidence thereof would be found on the premises to be searched." *Greene v. Reeves*, 80 F.3d 1101, 1106 (6th Cir. 1996) (quoting *United States v. Besase*, 521 F.2d 1306, 1307 (6th Cir. 1975)).

The issuing judge will grant a warrant if the allegations contained within the warrant affidavit establish that there is "a fair probability that evidence of a crime will be located on the premises of the proposed search." *United States v. Jenkins*, 396 F.3d 751, 760 (6th Cir. 2005) (quoting *United States v. Bowling*, 900 F.2d 926, 930 (6th Cir. 1990)). The reviewing court must give great deference to the magistrate judge's finding of probable cause, (*United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000)), and should only overturn the validity of a search warrant issued where the magistrate judge has arbitrarily abused its authority, (*United States v. Brown*, 732 F.3d 569, 573 (6th Cir. 2013)). The reviewing court is to examine the totality of the circumstances within the entire affidavit. *United States v. Ferguson*, 8 F.3d 385, 391–92 (6th Cir. 1993).

"It is well settled that in seeking suppression of [physical] evidence the burden of proof is upon the defendant to display a violation of some constitutional or statutory right justifying suppression." *United States v. Rodriquez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003) (quoting *United States v. Feldman*, 606 F.2d 673, 679 n.11 (6th Cir. 1979)). The defendant's burden extends to both "the burden of production and persuasion." *United States v. Patel*, 579 F. App'x

449, 453 (6th Cir. 2014).

Here, based on the totality of the circumstances in the affidavit, there was probable cause to believe that evidence of a crime would be found at both Doe Run Road and Valley Farms. The more than ten-page affidavit submitted with the warrant included factual allegations that create a sufficient nexus between the alleged illegal activity and the location searched. Halbleib actively investigated Wise for over a two-year period. [DE 24-2 at 69]. During that time, he determined that Wise resided at Doe Run Road and Valley Farms. *Id.* at 74. Two days before Halbleib searched Wise's residences, Wise agree to purchase six kilograms of cocaine. *Id.* at 69. Halbleib "monitored" the negotiations between Wise and the drug traffickers. *Id.* While they were negotiating, Wise visited Doe Run Road and Valley Farms. *Id.* In addition, around that same time, a reliable confidential informant told Halbleib that he/she saw Wise with guns. *Id.* at 71. Thus, there was probable cause to suspect that evidence of a crime would be found in Wise's residences.

**B.     Motion to Dismiss Indictment**

In his Motion to Dismiss, Wise argues that the Court should use its supervisory power to dismiss the indictment because: 1) "Mr. Wise had privacy and property rights under 18 USC §3122(a)(2) and under the 4th Amendment that were violated in this case when Halbleib and the Bullitt County Sheriff's Department obtained a search warrant and several trap and trace orders from a judge not authorized to sign them"; 2) "By broadcasting a substantial part of the investigation and vilifying Mr. Wise as the local representative of some 'cartel' the right to impartial jury is precluded"; and 3) "dismissal is the appropriate means by which to emphasize to all law enforcement that disregard of the law in the course of a criminal investigation will not be countenanced." [DE 25 at 82-83].

"The power of a district court to dismiss a grand jury indictment under the supervisory powers doctrine is premised on the inherent ability of the federal courts to formulate procedural rules not specifically required by the Constitution or Congress to supervise the administration of justice." *United States v. Streebing*, 987 F.2d 368, 371 (6th Cir.1993). "[T]he courts retain inherent supervisory authority over the law enforcement process which culminates in criminal proceedings brought before them." *United States v. Talbot*, 825 F.2d 991, 998 (6th Cir.1987). "The purposes underlying use of the supervisory powers are threefold: to implement a remedy for violation of recognized rights, to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before the jury, and finally, as a remedy designed to deter illegal conduct." *United States v. Hastings*, 461 U.S. 499, 505 (1983). "[T]he defendant is entitled to the extreme sanction of dismissal of the indictment only where he can prove that he was demonstrably prejudiced by the violation," even if "a constitutional right has been violated, deliberately or otherwise." *Talbot*, 825 F.2d at 998.

Here, the Court declines to exercise its supervisory power.

First, the Court found above that the "trap and trace" orders and search warrants did not violate Wise's rights. As there has been no violation, there can be no remedy.

Second, although Wise believes that Halbleib may have "vilified" him on Narcoland, the program depicted neither the execution of the search warrants nor the recovery of the guns. And despite Halbleib's claims about Wise's connections with the cartel, Halbleib recovered no illegal drugs during the search. Furthermore, although Wise's photograph appears in the show, it is blurry and non-descript. Finally, and perhaps most importantly, Halbleib never says that Eric Wise is "Ghost."

Wise also suggests that his ability to receive a fair trial is tainted by Halbleib's "reckless

conduct" on Narcoland. [DE 25 at 82] ("Halbleib's reckless conduct has made the chances of seating an impartial jury so remote as to be hardly worth calculating. If potential jurors missed the TV presentation they likely learned about it on social media"). There are two types of prejudice from pretrial publicity: presumptive and actual. *Foley v. Parker*, 488 F.3d 377, 387 (6th Cir. 2007). "Prejudice from pretrial publicity is rarely presumed." *Id.* This is not a case of presumptive prejudice because "an inflammatory, circus-like atmosphere" has not pervaded "the courthouse and the surrounding community." *Id.* And the "[t]he primary tool for discerning actual prejudice is a searching voir dire of prospective jurors," which the Court will conduct to determine whether "a prospective juror [is able] to lay aside his or her impressions or opinions and render a verdict based upon the evidence presented in court." *Id.; See Campbell v. Bradshaw*, 674 F.3d 578, 594 (6th Cir. 2012) (finding no prejudice—even though "Campbell's case was featured prominently in local media coverage and . . . most of the prospective jurors were aware of the case"—when "[c]ounsel and the trial court carefully questioned prospective jurors during voir dire concerning their knowledge of the case from news reports and whether they could judge the case based solely on the evidence that would be presented in court").

During the final pretrial conference, the Court informed the parties that—to reduce any potential prejudice from Narcoland[5]—it would ask the venire if they: 1) watch reality or crime TV; 2) agree that those shows do not necessarily accurately depict the criminal justice system; and 3) promise to base their decision solely on the evidence in the case, not on what they may have seen on those shows. Neither party objected to the Court's proposed questions. And although Wise

---

[5] The Court also told the parties that it would: 1) ask the venire if they were familiar with 6357 Doe Run Road or 9831 Valley Farms Blvd; 2) admonish the jury not to watch reality or crime TV shows during the trial; and 3) preclude any witnesses from testifying that Wise's nickname was "Ghost" or "Muncie."

11

did not submit voir dire questions in his pretrial memorandum as requested, the Court ordered that he could supplement the pretrial filings with requested voir dire questions to address this issue.

Finally, the Court declines to exercise its supervisory power because, as there has been no illegal conduct, there is no need to dismiss the indictment to deter it.

### III. CONCLUSION

Accordingly, for the reasons stated, and the Court being otherwise sufficiently advised, **IT IS ORDERED** that:

1) Wise's Motion to Suppress [DE 24] is **DENIED**.

2) Wise's Motion to Dismiss Indictment [DE 25] is **DENIED**.

Cc: Counsel of record